Monell, J.
No evidence was given or offered on the trial of this action, proving or tending to prove that any portion of the material used in printing the paper called “La Cronica,” and claimed to have been purchased by the plaintiff, was in the possession of the defendant at the commencement of the suit. Such property, if it existed, had previously gone into the possession of De Pena’s widow, who claimed it under the Spanish law, as heir-at-law of her husband ; or it was being administered by her as administratrix de son tort. In either case she alone could be called to account for it. But there was evidence that the type and material used in printing the paper, the publication of which is sought to be enjoined, was purchased by and belonged to the defendant. So much, therefore, of the plaintiff’s case as demanded an accounting. by the defendant for such property, fails, for the want of proof to support it; and the controversy is, accordingly, reduced to the single question of the right to restrain the future publication, by the defendant, of the paper called “ El Cronista.”
The plaintiff’s claim to the restraint was founded upon his purchase, at the public administrator’s sale, of the interest of De Pena in the newspaper called “ La Cronica,”' which the plaintiff claimed embraced, not only the type, cases, and presses used in printing, but also the exclusive right to the name and the good-will connected therewith; and that, therefore, the publication by the defendant of a newspaper bearing the same name, or of any name so similar in its appearance to the eye or in sound to the ear, as *50 was calculated to deceive the public into the belief that they were the same, was an invasion and infringement of his proprietary right in the former paper.
It was not disputed that De Pena, at the time of his death, was the sole proprietor of “La Cronica nor that the plaintiff acquired all the interest of De Pena in such publication. And it was conceded that Mrs. De Pena and the defendant, under a copartnership agreement, continued the publication of the paper from the period of De Pena’s death until May 4, 1867, without any material change, either in the name or in the typographical or general appearance, or. in the size and form of the paper. On that day, however, the publication of “La Cronica” ceased, and with its cession, the joint interests of Mrs. De Pena and the defendant in such publication also ceased. Thereupon, and before the public administrator’s sale, the publication of “El Cronista” was commenced by the defendant as its editor and sole proprietor.
I need not stop to ascertain what proprietary interest, if any, Mrs. De Pena, had in the publication of her deceased husband, nor under what right the publication was continued after his death. She at least was in possession, assuming the right to continue the publication for her own emolument, and was dispossessed, if at all, by an involuntary sale of her husband’s interest or property in the paper. What right of property there may be in what is commonly denominated the “good-will,” is not fully determined ; but such property, whatever it is, has never been protected, except where it has been made the subject of some express covenant between the parties. It may be sold by private agreement, and the stipulations of the parties in respect to it will be enforced ; but in the absence Of any covenant, and on a purchase at an involuntary sale, the vendee is not subrogated to all the rights of the original owner. This was the view intimated in respect to “copyrights,” in Stephens v. Cady (14 How. U. S., 528; and see McCardel v. Peck, 28 How. Pr., 120). Hence, it would seem to follow, that, whatever the plaintiff may have purchased, he did not acquire such a right of prop *51 erty in the name or title of “La Crónica” as would prevent its being assumed afterwards by another person.
If this case was to be determined solely upon whether the similarity, if it could be established there was any, of the names “La Cronica” and “El Cronista,” could mislead the public into the belief that they were the same, I should have no difficulty in reaching the conclusion, upon the evidence, that no such effect could or would result. An inspection of the several issues which were produced before me- disclosed such marked differences in the size, heading, typographical and general appearance of “La Cronica,” as published by De Pena in his lifetime, and the paper of the same name, issued by his widow and the defendant afterwards, that the issues of the later period would not, as I believe, be mistaken for or be regarded 'as a continuation of the earlier publication. And, independently of the clear difference in the signification of the names of “La Cronica” and “El Cronista,”—the one, according to the testimony of a highly-educated and very intelligent Spanish witness, meaning “the chronicle,” and the other “the chronicler,” the one “being the thing done, and the other the one that does it,”—there is so manifest a dissimilarity in the general appearance, both as respects the formation of the words and the character of the type employed in printing, that, as the witness before alluded to said, “no Spaniard could be mistaken.”
The case, however, in my judgment, is relieved of all difficulty, inasmuch as it clearly appears that upon or prior to the publication of “El Cronista,” the publication of “ La Cronica” had ceased. Por, I think, it cannot be successfully claimed tliat the one was merged in, or was even a continuation of the other. “La Cronica” was printed with the type and upon the presses of the original proprietor, under a copartnership arrangement between Mrs. De Pena and the defendant; whereas “El Cronista” was the sole property of the ‘defendant, both in the adoption of its name and in the type used in its printing. Unless, therefore, it can be sustained that the proprietorship of a newspaper is so exclusive and comprehensive that its *52 rights would he invaded "by a publication of another newspaper bearing a different title or name, the defendant’s publication cannot be claimed to be an infringement of any of the plaintiff’s rights. I do not understand that the protection which the law affords to “trademarks,” even assuming the name of a newspaper to be a trademark, goes so far as is claimed in this case. The protection which has been granted to that species of property has never, I believe, been extended over anything that was the subject of a patent or a copyright, but is confined to appropriations of names designating some particular manufacture or business. There can be no such property in a newspaper, except, -perhaps, in the name or title of the paper, which is the only continuing portion of it. The contents of each issue are the composition or creation of the editor or contributors, are varied each day, and when given to the public, all literary proprietorship in them is lost. And the law of trademarks, like the law of copyright, cannot be applied to a work of so fluctuating and fugitive" a character (Clayton v. Stone, 2 Paine, 392).
I do not mean to say that a newspaper proprietor can not appropriate, and, by long use, acquire a property in a name, which the courts will protect against piracy. In this respect the analogy of the rules of trademarks would apply (Dayton v. Wilkes, 17 How. Pr., 510). And I have no doubt that the names, so long appropriated and used, of “ The New york Herald,” or “ The Sun,'” would be protected as trademarks, against the assumption of those names by another proprietor. But that I understand to be the extent of the rule, and that any mere assimilation of the name—unless it was very clearly calculated to deceive the public—would not be unlawful.
There was not sufficient evidence on this trial that the public had been deceived. The plaintiff’s .evidence, and that of his only witness, was of too general a character to establish so important a fact. Besides, it was more than balanced by the evidence on the part of the defendant, before alluded to, that the names of the two papers were so dissimilar in signification, that no one acquainted with *53 the Spanish language could be decoyed into purchasing the one for the other. And the inspection which I have given of the several papers which were made exhibits before me, has confirmed me in the same belief.
Upon the whole case, therefore, I am of opinion that the defendant is entitled to judgment dissolving the in-, junction, and dismissing the complaint with costs.